Electronically Filed - Platte - Platte - October 29, 2021 - 12:21 PM

**IN THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI**

| | | |
|---|---|---|
| THOMAS NOON, | ) | |
| | ) | |
| CHRISTOPHER SKIDMORE, | ) | |
| | ) | Case No. |
| And | ) | |
| | ) | Division |
| CANDICE SKIDMORE, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF PLATTE WOODS, | ) | |
| MISSOURI, | ) | |
| | ) | |
| JOHN SMEDLEY, in his individual | ) | |
| capacity, | ) | |
| | ) | |
| And | ) | |
| | ) | |
| JIM KERNS, in his individual capacity, | ) | |
| | ) | |
| **Defendants.** | ) | |

EXHIBIT

**A**

Evrez & Jermn, P.C.

## PETITION FOR DAMAGES

Plaintiffs Tom Noon, Chris Skidmore, and Candice Skidmore, for their Petition for Damages, hereby allege and state:

## PARTIES

1.      Plaintiffs Thomas Noon Christopher Skidmore, and Candice Skidmore (collectively, "Plaintiffs") are all residents of Missouri.   Plaintiff Noon resides in Platte Woods, Platte County, Missouri, and Mr. and Mrs. Skidmore reside in Kansas City, Clay County, Missouri.

1

2.      Defendant City of Platte Woods, Missouri ("Platte Woods") is a municipal corporation located in Platte County, Missouri.

3.      Defendant John Smedley ("Smedley") is a resident of Missouri.

4.      Defendant Jim Kerns ("Kerns") is a resident of Missouri.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this matter because the unlawful acts and practices which form the basis of this action occurred in Platte County, Missouri and because Defendants reside in, and regularly transact business in, Missouri.

6.      Venue is proper in this Court pursuant to RSMo. § 508.010.

7.      Venue is proper in this Court pursuant to the Whistleblower's Protection Act, RSMo. §285.575, et seq. ("WPA") because the unlawful employment practices alleged herein occurred in Platte County, Missouri and this is a court of competent jurisdiction.

8.      At all times relevant to this Petition, Platte Woods has employed at least six (6) individuals in Missouri and Platte Woods is an "employer" under RSMO. § 285.575.2(2).

9.      Venue is proper in this Court pursuant to the Missouri Worker's Compensation Act, RSMo. §287.010, et seq. because the unlawful employment practices alleged herein occurred in Platte County, Missouri.

10.     Defendant Platte Woods is a covered employer under the Missouri Worker's Compensation Act, which includes "municipal corporations."

11.     Plaintiff Noon is protected by, and a covered employee under, the Missouri Worker's Compensation Act.

2

## WAIVER OF SOVEREIGN IMMUNITY

12.     Defendant Platte Woods purchased a liability insurance policy from Midwest Public Risk of Missouri for the coverage period June 1, 2019 to June 30, 2020 ("Policy").

13.     The Policy provides coverage for various claims against Platte Woods, including "Public Official/Employment Liability" claims.

14.     The Policy states that the insurance company will pay, on Platte Woods' behalf, "all monies the Member (Platte Woods) becomes legally obligated to pay as damages for a claim arising out of a wrongful act."

15.     The Policy defines "wrongful act" as "an actual or alleged error, misstatement, act, omission, neglect or breach of a Member's duty, including….violation of civil rights or discrimination, including unfair employment practices."

16.     Under the Policy, the term "unfair employment practices" is defined as "employment-related practices for or arising out of any actual or alleged wrongful dismissal, discharge, or termination…of an employee….wrongful deprivation of career opportunity or reassignment, wrongful discipline….or failure to provide adequate employee policies and procedures."

17.     As stated in the Policy, "unfair employment practices also means claims brought under local, state or federal law, whether common or statutory."

18.     Platte Woods has waived sovereign immunity by purchasing liability insurance that covers unfair employment practices, which includes the those encompassed by the statutory employment claims alleged in this Petition.

3

**FACTS COMMON TO ALL COUNTS**

19.     Plaintiff Noon was employed by Platte Woods in 1995 as a police officer for the Platte Woods Police Department ("PWPD").

20.     Prior to 2017, Mr. Noon worked at the direction of former Chiefs of Police Michael Benne and Larry Cory.

21.     During his twenty-four (24) years as a police officer with PWPD, Mr. Noon did not receive any formal disciplinary action.

22.     In 2017, after former Chief Benne passed away, Smedley promoted Kerns to acting Chief of Police, which was approved by Platte Woods' Board of Aldermen, and approximately six months later, Kerns became Chief of Police.

23.     Also in 2017, Mr. Noon was promoted to Deputy Chief of Police.

24.     Per Platte Woods' chain of command, the Deputy Chief of Police reports to the Chief of Police, and the Chief of Police reports to the Mayor.

25.     At all times relevant to this Petition, Platte Woods employed Kerns as Chief of Police. Kerns had supervisory authority over Plaintiffs, including the ability to make decisions affecting the terms and conditions of Plaintiffs' employment with Platte Woods, to include decisions about employee discipline.

26.     As Chief of Police, Kerns was the top of the chain of command within PWPD and he was ultimately responsible for all functions of PWPD.

27.     At all times relevant to this Petition, Smedley was Mayor of Platte Woods. Smedley had supervisory authority over Plaintiffs, including the ability to make decisions affecting the terms and conditions of Plaintiffs' employment with Platte Woods.

28.     At all times relevant to this Petition, Smedley had supervisory authority over Kerns, including the ability to make decisions affecting the terms and conditions of Kerns' employment with Platte Woods, to include decisions about employee discipline.

29.     Plaintiff Christopher Skidmore was hired as a police officer for PWPD in 2010, and in October 2018, he was promoted to Sergeant.

30.     Throughout his employment with PWPD, Mr. Skidmore did not receive any formal disciplinary action.

31.     In November 2018, Mr. Skidmore's wife, Candice Skidmore, began her employment with PWPD as a part-time "reserve" police officer.

32.     Mrs. Skidmore performed primarily administrative work, including the review of PWPD officers' daily activity logs. The logs documented of PWPD officers' daily duties, to include car stops, calls for service, and vehicle maintenance checks.

33.     Additionally, at Kerns' request, Mrs. Skidmore worked as a court liaison by acting as a backup court clerk during "court night," which occurred on the first Tuesday of the month.

34.     Mrs. Skidmore had no formal discipline during her employment with PWPD.

35.     Another police officer, Robert Cutler, began working for PWPD in May 2018 as a reserve officer.

36.     During Plaintiffs' employment, Kerns regularly and openly engaged in non-work-related activities while on police duty.

37.     Kerns owns and operates an accounting consulting business, and he regularly performed work for this business while at PWPD.  Mr. Skidmore observed that

Kerns would have weekly conference calls for his accounting business during his on-duty hours and in the presence of his staff. Kerns would conduct accounting business using his cell phone, laptop, and PWPD computers.

38.    Kerns has a Platte Woods city vehicle that he uses for both professional and personal needs.

39.    Smedley and Kerns entered into an agreement that allowed Kerns to perform work for his accounting business while present at PWPD; however, Smedley never required Kerns to log his on-duty hours.

40.    As part of Smedley's agreement with Kerns, Kerns was allowed to use city property to perform work for his accounting business, to include a city computer and the city vehicle assigned to Kerns.

41.    Kerns is a member of the Ararat Shriners organization, for which he serves on two committees. During Plaintiffs' employment, Mr. Skidmore witnessed Kerns performing tasks for the Shriners during police office hours, including lengthy phone calls, and Mr. Skidmore also observed that Kerns drove PWPD's vehicle to Shriner events throughout the state.

42.    Mr. Skidmore made complaints to then-Corporal Dave Gallaher, as well as Mr. Noon, that Kerns regularly engaged in non-police business while on duty.

43.    Although he had his own dedicated work area, Kerns would work at the main office computer alongside Corporal Gallaher. On several occasions during 2019, Gallaher also complained to Mr. Noon about Kerns' engagement in non-police business while on duty, which Gallaher claimed occurred on every shift.

44.     During their employment, Mr. Noon and Mr. Skidmore observed that Kerns was not implementing many of the standard operating procedures set forth in the Platte Woods Police Department Policy Manual.  In the course of reviewing PWPD officers' daily activity logs, Mrs. Skidmore discovered several policy violations that she brought to Kerns' attention on several occasions; however, Kerns did not provide responses to her concerns.

45.     Mr. Skidmore complained to Kerns on several occasions that PWPD officers were being required to operate declining police vehicles that were often in need of repair, including multiple repairs to one vehicle for the same problem.

46.     Mrs. Skidmore reported multiple safety concerns to her superiors about the main police vehicle used by PWPD; specifically, the vehicle did not have an operable driver's side airbag, so the airbag light in the vehicle was constantly illuminated. Mrs. Skidmore reported the airbag problem to Gallaher and Kerns.

47.     Mrs. Skidmore believed the airbag issue was a serious safety concern and a violation standard of police protocol, which required such vehicles to be taken out of service.  When complaining about the airbag issue, Mrs. Skidmore was concerned about the risk of serious injury or death to herself or anyone that was driving that vehicle.

48.     Mrs. Skidmore also reported to Kerns and Gallaher her concerns about another malfunction with the main PWPD vehicle: whenever the high beams were turned on, all of the vehicle's emergency lights were activated.  Mrs. Skidmore believed this malfunction created a safety issue for pedestrians.

7

49.     Mrs. Skidmore personally experienced the vehicle's airbag and lighting malfunctions as a patrol officer, and she also observed that other officers documented these issues on their daily activity logs.

50.     In 2019, Mr. Cutler complained to Gallaher and Smedley that the police evidence was not being handled properly and that the evidence room was not in satisfactory condition, including inaccurate documentation of evidence.

51.     In 2019, Mr. Skidmore and Cutler made complaints to Noon about the demeanor and mental health of another PWPD officer. One such complaint by Mr. Skidmore—which was also relayed to Kerns—was that the officer made "threatening" comments on social media.

52.     In a mid-August 2019 email to Gallaher and Noon, Cutler also expressed his concerns about the above PWPD officer's demeanor and his reported 30-day medical leave from his other employment due to mental health issues, stating, in part: "My only concern with [the officer] is he has a current disposition that is clearly off…I am concerned that he is even on patrol…we have a duty to be honest with ourselves and protect him and the public."

53.     Mrs. Skidmore made several complaints to Gallaher about the PWPD officer, including his demeanor during a traffic stop on which she assisted the officer.

54.     On or about September 5, 2019, Cutler submitted a confidential written complaint about the PWPD officer's intimidating behavior toward Cutler and in which Cutler expressed concern for his safety.

55.     PWPD has a confidential reporting policy with regard to officer complaints about other officers.  After learning that Cutler had lodged the above confidential complaint

Electronically Filed - Platte - October 29, 2021 - 12:21 PM

about the PWPD officer—whom Noon had placed on a Performance Improvement Plan after numerous policy violations—Noon became even more concerned about the officer's mental state; Noon was concerned that the officer, who carried a firearm, posed a danger to the public.

56.     Noon shared his concerns about the officer in confidence with Kerns, per PWPD's confidential officer reporting policy. However, Noon later received information that Kerns had violated the policy by relaying Noon's concerns to the officer.

57.     On September 9, 2019, after learning that Kerns had disclosed Noon's confidential concerns to the officer, in conjunction with his concerns about PWPD policy violations and other issues involving Kerns, Noon met with Kerns. He told Kerns that Kerns could either resign as Chief or that Noon would report all of his policy violations to Smedley.

58.     Subsequently on September 9, 2019, in a two-hour phone call with Smedley, Noon complained to Smedley about a litany of issues involving Kerns, including public safety issues and the fact that Kerns was working on his accounting business while on duty for PWPD.

59.     Noon, Mr. Skidmore, Cutler, and others collaborated in creating a written complaint about Kerns.

60.     The written complaint contained allegations that, among other things, Kerns was responsible for:

    a.  Requiring officers to operate—and declining to repair—vehicles in unsafe conditions, to include the inoperable airbag and malfunctioning emergency lights, spotlights, and dash cameras;

    b.  Improperly handling, and thereby compromising, police evidence;

    c.  Violating hiring policies (including background checks, medical exams, reference checks, and completion of the FTO program) when hiring a fellow Shriner as a detective;

    d.  Failure to pursue prosecution of cases for assault and identity theft, despite ample evidence to warrant submission to the city attorney for potential charge filing;

    e.  Failure to reconcile cash receipts for at least $3,000 in city fine payments until it was brought to the city's attention by a reserve officer;

    f.  Invading officer privacy by knowingly allowing voice recording activation in vehicles at times not permitted by policy; and

    g.  Incomplete and inaccurate recordkeeping, including duty logs and crime reports.

61.    Noon, Cutler, and others created a "Supplemental Complaint," which contained 70 additional allegations of policy violations, to include:

    a.  Knowingly allowing a failed radar detector to operate, which resulted in numerous drivers receiving incorrect speeding citations;

    b.  Missing recording system and body camera in a particular vehicle;

    c.  Inadequate or no action taken in response to reports of black mold at PWPD;

    d.  Requiring officers to wear body cameras with audio which recorded officers at all times without their acknowledgment, including lunch and restroom breaks, thereby violating their right to privacy and PWPD policy; viewing said recordings for no reason related to police business; and

    e.  Failure to supervise and direct a drug take-back program, which allowed an officer the opportunity to steal illegal drugs that were being held in police custody.

62.    On September 12, 2019, Noon and Mr. Skidmore caused the written complaint, Supplemental Complaint, and a copy of PWPD's Standard Operating Procedures containing approximately 180 highlights to policies that the officers claimed had been or were being violated (collectively, the "Complaint Packet") to be delivered to

10

Smedley. A copy of the Complaint Packet was also delivered to Platte Woods' Board of Aldermen.

63.     Gallaher took no part in the drafting or submission of the Complaint Packet.

64.     On or about September 20, 2019, Cutler submitted the Complaint Packet to the Missouri Attorney General's Office. Upon learning of the filing, Smedley contacted Noon and Mr. Skidmore, who requested a third-party audit be conducted by an unbiased entity not affiliated with Platte Woods.

65.     In mid-to-late October 2019, Cutler was notified by Smedley that his employment was being terminated.

66.     Although Smedley and Kerns were aware of the identities of the complaining officers, on November 14, 2019, Noon sent a letter to Smedley which states, in part: "this letter is to notify you that I am one of the anonymous subjects involved in the list of allegations sent to you and the City Alderman on or about September 12, 2019" and requesting that any third party investigation into the allegations remain open until Noon could be interviewed by a third party investigator.

67.     Also on November 14, 2019, Mr. Skidmore sent a letter to Smedley in which he identified himself as "a party to those anonymous allegations." In the letter, he requested that any third-party investigation remain open until he could be interviewed by a third party investigator and also that the letter be shared with each member of the Board of Aldermen.

68.     On November 21, 2019, Noon emailed Smedley, Kerns, and Gallaher about the airbag issue in PWPD's vehicle and asking for approval to proceed with repairs.

Electronically Filed - Platte - October 29, 2021 - 12:21 PM

69.     After Mrs. Skidmore made complaints about PWPD's vehicle issues and the demeanor of the PWPD officer, several of Mrs. Skidmore's job duties were taken away without explanation: she was no longer responsible for reviewing the PWPD daily activity logs—a task that was reassigned to another part-time officer; her responsibility for scanning officer log sheets after officers' completion; her role as court clerk that had been requested by Kerns was removed; and, Gallaher notified Mrs. Skidmore that she was prohibited from further scanning or printing PWPD documents.

70.     In late November 2019, Mr. Skidmore's administrative rights were blocked on Planit Schedule, PWPD's electronic scheduling program; as a result, he was not able to assign shifts to PWPD officers, which was one of his job responsibilities.

71.     On December 4, 2019, an article was published in the Platte County Citizen entitled "'Whistleblowers' file corruption complaint filed against mayor, police chief," and direct quotes from Smedley appeared in the news article.

72.     On December 6, 2019, after Kerns learned that an alleged email reciting the Complaint Packet had been sent to the Shriners organization, Kerns expressed his belief to Smedley that only Mr. Noon, Mr. Skidmore, and Mr. Cutler had access to the Complaint Packet.

73.     On or about December 6, 2019, Smedley publicly issued a letter in which he acknowledged the allegations in the Complaint Packet and referred to them as "retaliatory in nature."

74.     On December 16, 2019, Noon sent a memorandum to Kerns and Smedley as an addendum to the PWPD officer's Notice of Violation of Performance Improvement Plan in which he expressed his continuing concerns over the officer's mental state and

acknowledged that Kerns and Smedley had not responded to his request for a meeting to discuss the officer.

75.     After the submission of the Complaint Packet, Mr. Skidmore was taken off the PWPD work schedule and was not allowed to sign up for his own work shifts.   On occasions when Mr. Skidmore attempted to assign shifts to other PWPD officers, as part of his job duties, Kerns would change the schedule to accommodate the PWPD officer about whom Noon had received complaints.  Mr. Skidmore observed that this PWPD officer was able to sign up for the majority of available shifts.

76.     Mrs. Skidmore was also unable to sign up for available work shifts; however, she learned from Gallaher that shifts were available. On one occasion, Mrs. Skidmore observed, on Planit Schedule, a shift that was available when another officer had called in sick, but the day was "grayed out" for her on the schedule, such that she could not sign up for the shift.

77.     Mr. Skidmore worked shifts in November and December 2019, but before January 1, 2020, he was taken off PWPD's work schedule and as of January 1, 2020, he was not allowed to sign up for any work shifts.

78.     Also, work shifts that were requested by the Skidmores for court night in February 2020 were removed from the schedule.

79.     When Mr. Skidmore attempted to remove certain documents from his work Dropbox folder in January 2020, someone at the PWPD had removed various documents from it before he could retrieve them. The records that were removed included police officer log sheets and internal memos from Cutler regarding the welfare of the PWPD officer about whom he had complained.

80.     On December 30, 2019, Noon suffered a work-related injury and submitted a claim for benefits through Platte Woods' worker's compensation carrier.

81.     The physician who evaluated Noon for his work-related injury prescribed light duty as a temporary work restriction, of which Kerns was made aware.

82.     Desk duty work was available at the Department, but Noon was not assigned desk duty or any other light duty work.  However, another part-time reserve officer was allowed to work desk duty on Sundays.

83.     Abruptly and without notice, Noon's access to online shift scheduling was removed. Mr. Noon's last day of work for PWPD was December 30, 2019.

84.     On January 7, 2020, Noon and Mr. Skidmore sent a letter to Smedley acknowledging his December 6, 2019 letter indicating that the allegations were "retaliatory in nature," and they reiterated their prior written requests that any investigation into their allegations remain open and until each of them could be interviewed by third party investigators.

85.     Effective January 1, 2020, Plaintiffs were not allowed to work as PWPD police officers.

86.     Upon information and belief, at least five individuals were commissioned as reserve officers for PWPD from January 1, 2020 to April 14, 2021.

87.     On or about January 14, 2020, Mrs. Skidmore sent a written complaint to Noon documenting her experience the previous evening at court night. When Mr. and Mrs. Skidmore appeared for court night, other officers present blatantly ignored them.  Mr. Skidmore attempted to speak with the court clerk and the bailiff, both of whom did not even acknowledge Mr. Skidmore's presence. When Mrs. Skidmore attempted to perform

14

her regular tasks as she had done for a decade, the PWPD officer (about whom Cutler and Noon had previously expressed concern to Kerns) stepped in and took over her duties without saying a word to her.

88.     Also on January 14, 2020, Noon was unable to access his office at PWPD because his security code to the door that led to his office had been changed without notice.

89.     On or about February 26, 2020, Plaintiffs each received a letter from Smedley, Kerns, and Gallaher—who had recently been promoted to Assistant Chief of Police—notifying them that on January 1, 2020, the Department had begun a "provisional operations period utilizing full-time officers to cover all shifts." The letter also stated, "We have decided to dissolve the Reserve Unit, effective March 13, 2020…We will be reporting the separation to POST [Police Officer Standards and Training Program] in a manner favorable to the affected officers."

90.     As of April 17, 2020, the POST database had an updated officer list that did not include Plaintiffs; however, nine part-time reserve officers appeared as still commissioned with Platte Woods.

91.     As of April 2021, at least four part-time reserve officers with whom Plaintiffs had worked were still employed with PWPD.

92.     Plaintiffs' employment with Platte Woods was discharged.

<u>**Count I – Retaliatory Discharge Under the WPA**</u>
**(Plaintiffs v. Defendant Platte Woods)**

93.     Plaintiffs hereby incorporate by reference all of the above paragraphs as though fully set forth herein.

94.     At all times relevant to this Complaint, Plaintiffs were employees of Platte Woods.

15

95.     A "proper authority" under the WPA includes "…the employee's supervisor employed by the employer…" RSMo. § 285.575.2(3).

96.     A "protected person" under the WPA includes "an employee of an employer who has reported to the proper authorities an unlawful act of his or her employer; an employee of an employer who reports to his or her employer serious misconduct of the employer that violates a clear mandate of public policy as articulated in a constitutional provision, statute, or regulation promulgated under statute; or an employee of an employer who has refused to carry out a directive issued by his or her employer that if completed would be a violation of the law." RSMo. § 285.575.2(4).

97.     As alleged herein above and through their written complaints, Plaintiffs reported serious misconduct and/or violations of law by Kerns, Smedley, and Platte Woods, including, but not limited to, serious issues pertaining to employee and public safety, invasion of privacy, and the mishandling and misuse of public funds as prohibited by municipal rules.

98.     The Occupational Safety and Health Act, 29 C.F.R. 1910, et seq. ("OSHA") requires private employers to provide a safe and hazard-free workplace for its employees.

99.     Section 5(a)(1) of the OSH Act, or P.L. 91-596 (the "General Duty Clause") provides that an employer "shall furnish to each of his employees…a place of employment…free from recognized hazards that are causing or are likely to cause…serious physical harm to his employees." 29 U.S.C. 654(a)(1).

100.    As alleged herein, Plaintiffs reported to their supervisors, a "proper authority," that—among other issues set forth it their written complaints—a vehicle which police officers were required to operate had multiple defects.

16

101.     Plaintiffs each believed that driving a vehicle with said hazardous defects placed the Department's employees and the public at risk of serious physical harm.

102.     The requirement that Platte Woods employees operate vehicles with hazardous defects is serious misconduct that that violates a clear mandate of public policy—a mandate of a safe and hazard-free workplace, as articulated in OSHA.

103.     Each of the Plaintiffs is a "protected person" under the WPA.

104.     Plaintiffs' employment with Platte Woods was discharged.

105.     Plaintiffs' status as protected individuals was the motivating factor for their discharges, which constitutes retaliatory discharge due to whistleblowing.

106.     As a direct and proximate result of Platte Woods' retaliatory discharges of Plaintiffs, Plaintiffs have been damaged.

107.     Plaintiffs have suffered economic damages, including lost wages.

108.     Further, Defendant's conduct was outrageous because of Defendant's evil motive or reckless indifference to Plaintiffs' rights and Plaintiffs are entitled to liquidated damages pursuant to RSMo. § 285.575.7(3).

WHEREFORE, for those reasons stated hereinabove, Plaintiffs pray for damages against Defendant Platte Woods as follows:

a.   Back pay, including wages and benefits;

b.   Double the amount of Plaintiffs' award of back pay, pursuant to RSMo. §285.575.7(3).

c.   Pre-judgment and post-judgment interest;

d.   Costs and reasonable attorneys' fees, along with all other statutory damages and remedies as permitted by the WPA; and

17

e. Any other relief this Court deems fair and reasonable.

**Count II – Retaliatory Discharge in Violation of**
**The Missouri Worker's Compensation Act**
**(Plaintiff Noon v. Defendant Platte Woods)**

109. Plaintiffs hereby incorporate by reference all of the above paragraphs as though fully set forth herein.

110. While employed by Platte Woods, Plaintiff Noon suffered a work-related injury.

111. While employed by Platte Woods, Plaintiff sought and received medical treatment for his work-related injury, a right to which Plaintiff was entitled under the Missouri Worker's Compensation Act, RSMo. Section 287.010, et seq., and therefore Plaintiff engaged in protected activity.

112. Defendant had knowledge of Plaintiff's worker's compensation injury and medical treatment, and Defendant had knowledge that Plaintiff engaged in protected activity.

113. Plaintiff's employment with Platte Woods was discharged.

114. Plaintiff was receiving medical treatment for his worker's compensation injury at the time of his discharge.

115. Plaintiff's engagement in protected activity under Missouri's Worker's Compensation Act was a motivating factor to Plaintiff's discharge from employment, in violation of Missouri public policy.

116. Plaintiff has been damaged by Defendant's illegal conduct in that he has suffered economic damages, including but not limited to, lost wages and fringe benefits, and noneconomic damages in the form of pain and suffering, including, but not limited to,

18

mental and emotional distress, humiliation, embarrassment, inconvenience, and loss of enjoyment of life.

117.    Defendant's conduct was outrageous due to its evil motive or reckless indifference to Plaintiff's rights, thereby entitling Plaintiff to punitive damages.

118.    Defendant's actions constitute retaliatory discharge in violation of RSMo. § 287.780.

WHEREFORE, for those reasons stated hereinabove, Plaintiff Noon prays for damages against Defendant Platte Woods in an amount in excess of the minimum jurisdictional requirements of this Court which is sufficient to compensate Plaintiff for the injuries and damages he sustained and for his costs and disbursements incurred herein, and for such other and further relief as the Court deems just and proper.

### Count III – First Amendment Retaliation in Violation of § 1983
### (All Plaintiffs v. Defendant Kerns)

119.    Plaintiffs hereby incorporate by reference all of the above paragraphs as though fully set forth herein.

120.    As alleged herein above, Plaintiffs reported and complained about serious misconduct and/or violations of law by Kerns, Smedley, and Platte Woods, to include issues pertaining to public safety and taxpayer funds.

121.    As alleged herein above and through their reports and complaints, Plaintiffs engaged in speech on various matters of public concern, as protected under the First Amendment.

122.    By exercising their rights to speak on such matters of public concern, Plaintiffs engaged in protected activity.

123.    As alleged herein, Plaintiffs were subject to various retaliatory acts, including, but not limited to the removal of Mrs. Skidmore's job duties, Plaintiffs' inability to sign up for work shifts, failing to provide Plaintiff Noon with light duty work, and Plaintiffs' discharge.

124.    Plaintiffs were subjected to retaliatory acts taken by Kerns or at Kerns' direction.

125.    Plaintiffs were subjected to retaliatory acts by Kerns, individually or in concert with Smedley.

126.    Defendant Kerns' actions were taken under color of state law.

127.    By and through his actions, Defendant Kerns deprived Plaintiffs of their First Amendment right to free speech.

128.    Plaintiffs' engagement in protected activity was a substantial and/or motivating factor in Defendant's actions.

129.    As a direct and proximate result of Defendant's actions, Plaintiffs have been damaged.

130.    Plaintiffs have been damaged by Defendant's illegal conduct in that they have suffered economic damages, including but not limited to, lost wages, and noneconomic damages in the form of pain and suffering, including, but not limited to, mental and emotional distress, humiliation, embarrassment, inconvenience, and loss of enjoyment of life.

131.    Defendant's conduct was intentional and outrageous due to his evil motive or reckless indifference to Plaintiffs' rights, thereby entitling Plaintiffs to punitive damages as provided by §1983.

132.   Further, Plaintiffs are entitled to prevailing party costs and reasonable attorneys' fees.

WHEREFORE, for those reasons stated hereinabove, Plaintiffs pray for damages against Defendant Jim Kerns for actual compensatory and economic damages in such amounts which is sufficient to compensate them for their damages incurred herein and which shall be determined at trial, for statutory punitive damages, reasonable attorney's fees and costs incurred herein, for pre- and post-judgment interest, and for such other and further relief as the Court deems just and proper.

<u>**Count IV – First Amendment Retaliation in Violation of § 1983**</u>
**(All Plaintiffs v. Defendant Smedley)**

133.   Plaintiffs hereby incorporate by reference all of the above paragraphs as though fully set forth herein.

134.   As alleged herein above, Plaintiffs reported and complained about serious misconduct and/or violations of law by Kerns, Smedley, and Platte Woods, to include issues pertaining to public safety and taxpayer funds.

135.   As alleged herein above and through their reports and complaints, Plaintiffs engaged in speech on various matters of public concern, as protected under the First Amendment.

136.   By exercising their rights to speak on such matters of public concern, Plaintiffs engaged in protected activity.

137.   As alleged herein, Plaintiffs were subject to retaliatory acts.

138.   Plaintiffs were subject to retaliatory acts taken by Smedley, at Smedley's direction, and/or in concert with Kerns.

139.   Defendant Smedley's actions were taken under color of state law.

21

140.    By and through his actions, Defendant Smedley deprived Plaintiffs of their First Amendment right to free speech.

141.    Additionally, as alleged herein, Kerns engaged in actions under color of state law that deprived Plaintiffs of their constitutional right to free speech.

142.    At least some of Kerns' actions occurred at Smedley's direction or with Smedley's knowledge or consent.

143.    At times relevant herein, in addition to his own actions, Smedley failed to intervene to prevent Kerns from violating Plaintiffs' constitutional rights, as prohibited by Section 1983.

144.    Plaintiffs' engagement in protected activity was a substantial and/or motivating factor in Defendant Smedley's actions taken under color of state law.

145.    As a direct and proximate result of Plaintiffs' discharge, Plaintiffs have been damaged.

146.    Plaintiffs have been damaged by Defendant Smedley's illegal conduct in that they have suffered economic damages, including but not limited to, lost wages, and noneconomic damages in the form of pain and suffering, including, but not limited to, mental and emotional distress, humiliation, embarrassment, inconvenience, and loss of enjoyment of life.

147.    Defendant Smedley's conduct was intentional and outrageous due to his evil motive or reckless indifference to Plaintiffs' rights, thereby entitling Plaintiffs to punitive damages as provided by §1983.

148.    Further, Plaintiffs are entitled to prevailing party costs and reasonable attorneys' fees.

WHEREFORE, for those reasons stated hereinabove, Plaintiffs pray for damages against Defendant John Smedley for actual compensatory and economic damages in such amounts which is sufficient to compensate them for their damages incurred herein and which shall be determined at trial, for statutory punitive damages, reasonable attorney's fees and costs incurred herein, for pre- and post-judgment interest, and for such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all claims in this Petition.

Respectfully submitted,

SMITH MOHLMAN INJURY LAW, LLC

/s/  *Michael Stipetich*
Michael Stipetich MO # 62291
701 E. 63rd Street, 3rd Floor
Kansas City, Missouri 64110
816.866.7711 (office)
816.866.7715 (fax)
stip@accidentlawkc.com
ATTORNEYS FOR PLAINTIFFS