IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| THOMAS NOON, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 21-CV-06159-SRB |
| ) | |
| CITY OF PLATTE WOODS, ) | |
| MISSOURI, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## ORDER

Before the Court is Defendant City of Platte Woods, Missouri ("Platte Woods"), Mayor John Smedley ("Smedley"), and Chief of Police James Kerns' ("Kerns") (collectively, "Defendants") Motion for Summary Judgment. (Doc. #28.) For the reasons stated below, the motion is GRANTED IN PART AND DENIED IN PART.

### I.   BACKGROUND

This lawsuit arises out of the termination of Plaintiff Thomas Noon ("Noon"), Christopher Skidmore ("Mr. Skidmore"), and Candice Skidmore's ("Mrs. Skidmore") (collectively, "Plaintiffs") employment with the Platte Woods Police Department ("PWPD"). For the purpose of resolving the pending motion, the following facts are uncontroverted or deemed uncontroverted by the Court.[1] Additional facts relevant to the parties' arguments are set forth in Section III.

---

[1] The Court notes that the applicable standard requires the facts to be viewed in the light most favorable to the nonmoving party, Plaintiffs. The relevant facts are taken from the record, including the parties' briefs and exhibits. The parties' briefs contain voluminous facts which, for reasons explained below, are not germane to the Court's decision. Only those facts necessary to resolve the pending motion are discussed, and those facts are simplified to the extent possible.

Smedley is the Mayor of Platte Woods, a municipality within the state of Missouri. In 2017, Kerns became Chief of Police of the PWPD. In addition to serving as Chief of Police, Kerns owns and operates an accounting consulting business, drives for Lyft and Uber, and is a member of the Ararat Shriners organization. Noon started working at the PWPD as a police officer in 1995. After Kerns became Chief of Police in 2017, Noon was promoted to Deputy Chief of Police. Noon was responsible for patrol, responding to calls, rotation of on-call officers, assisting and informing on-duty officers, and was the emergency management director for Platte Woods.

Mr. Skidmore was first hired as a police officer for the PWPD in 2010 and was promoted to Sergeant in 2018. Mr. Skidmore was partially responsible for assigning shifts to other officers and vehicle maintenance. In November 2018, Mrs. Skidmore was hired as a police officer for the PWPD. She had patrol duties and served as one of the backup court clerks for Platte Woods. Mrs. Skidmore also reviewed PWPD officers' daily activity logs.

Over the course of their employment, Plaintiffs observed and voiced several concerns about the PWPD and Kerns' performance as Chief of Police. For example, Mrs. Skidmore observed that officers would not complete their daily police activity logs. She made complaints to her superiors about safety issues with PWPD vehicles, including missing airbags and faulty emergency lights. Mrs. Skidmore was also concerned that various officers would return home while still on their shifts. Mr. Skidmore brought to Kerns' attention that officers were required to operate poorly conditioned vehicles, officers failed to pursue investigations with the correct course of action, and the PWPD radar system provided false readings. Mr. Skidmore also complained about Kerns using PWPD time to conduct his personal business. Mr. Skidmore claims Kerns did not address these issues.

Mr. Skidmore and Mrs. Skidmore also had concerns about their fellow officer, William Babbitt ("Babbitt").  For instance, Mr. Skidmore did not believe Babbitt was fit to be a police officer, and complained that Kerns was assigning more favorable shifts to Babbitt.  Mrs. Skidmore also informed Noon that Babbitt allegedly made threatening comments on social media.  Noon brought these concerns to Kerns' attention.

On September 9, 2019, frustrated with the PWPD's direction under Kerns, Noon asked Kerns to meet with him for coffee.  During that meeting, Noon informed Kerns that he was displeased with Kerns' performance as Chief of Police, told Kerns he felt he was dishonest, encouraged Kerns to resign as Chief of Police, and handed Kerns a pre-drafted resignation letter for Kerns to sign.  Kerns did not resign as Chief of Police.  Later that day, Noon called Smedley and informed him about several issues he had with Kerns, including that Kerns worked on his private bookkeeping business while on duty.

On September 12, 2019, a document containing a list of concerns regarding the PWPD ("Complaint Packet") was sent to Smedley and the Platte Woods Board of Aldermen.  Plaintiffs, as well as other officers, contributed to the contents of the Complaint Packet.  However, at the time of delivery, the Complaint Packet authors were anonymous.  The Complaint Packet included a summarized list of officers' issues with Kerns' ability to perform his duties as Chief of Police, which, according to the Complaint Packet, "led to chronic, systemic, and significant issues within [PWPD]."  (Doc. #29-6, p. 1.)  The Complaint Packet also included a copy of the PWPD standard operating procedures which noted "over 180 violations," and included "a supplemental document with numerous other examples of specific public safety concerns or simply things that discourage officers."  (Doc. #29-6, p. 2.)

On November 14, 2019, displeased with the lack of investigation into the Complaint Packet's allegations, Mr. Skidmore and Noon both sent letters to Smedley informing him that they were involved in creating the Complaint Packet. Sometime after raising concerns about PWPD vehicles and Babbitt, several of Mrs. Skidmore's job duties were taken away. In late November 2019, Mr. Skidmore's administrative rights were blocked, and he was no longer able to assign shifts.

On December 4, 2019, a local newspaper wrote about the Complaint Packet and its various allegations. On December 6, 2019, Kerns learned that an anonymous email was sent to the Ararat Shrine which reiterated the contents of the Complaint Packet. Kerns reached out to Smedley and discussed that Noon or Mr. Skidmore may have been involved with leaking the document to the Ararat Shrine. On January 7, 2020, Noon and Mr. Skidmore wrote another letter to Smedley. In that letter, they informed Smedley that they learned the investigation into their allegations was closed despite neither officer being interviewed. Mrs. Skidmore wrote a formal complaint on January 14, 2020, noting that when she and Mr. Skidmore went to work on January 13, 2020, they were ignored by other officers. When Mrs. Skidmore went to work her regular shift, Babbitt took over her duties. In January 2020, Plaintiffs were removed from the PWPD schedule, and by March 2020, all had been laid off. Plaintiffs subsequently sued Defendants in the Circuit Court of Platte County, Missouri.

That action ("First Lawsuit") was eventually removed to this Court. The First Lawsuit alleged three counts: Count I: Retaliatory Discharge Under the Whistleblower's Protection Act ("WPA"), § 285.575.2(3); Count II: Retaliatory Discharge in Violation of The Missouri Workers' compensation Act on behalf of Noon; Count III: First Amendment Retaliation in Violation of § 1983. The Court eventually granted summary judgment for the Defendants and

found that Plaintiffs failed to properly sue the two defendants in their individual capacities. Also, the Court found that Plaintiffs had not presented evidence of an unconstitutional custom.

Plaintiffs later filed this lawsuit (the "Second Lawsuit") on October 29, 2021, and, like the First Lawsuit, reasserted the following claims: Count I: Retaliatory Discharge Under the WPA, § 285.575.2(3); Count II: Retaliatory Discharge in Violation of The Missouri Workers' Compensation Act ("MWCA") on behalf of Noon; Count III: First Amendment Retaliation in Violation of § 1983 against Defendant Kerns; Count IV: First Amendment Retaliation in Violation of § 1983 against Defendant Smedley. Defendants now move for summary judgment on all counts, and Plaintiffs oppose the motion. The Court addresses the parties' arguments below.

## II. LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of identifying "the basis for its motion, and must identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (cleaned up). If the moving party makes this showing, "the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial." *Id.* (quotation marks omitted). If there is a genuine dispute as to certain facts, those facts "must be viewed in the light most favorable to the nonmoving party." *Id.*

## III. DISCUSSION

### A. Count I: Retaliatory Discharge Under WPA, § 285.575.2(3)

Defendants move for summary judgment on Count I, asserting a Retaliatory Discharge Under the WPA claim against Defendant Platte Woods. Defendants argue that because the WPA

5

only proscribes the actions of an "employer," and Platte Woods is not an "employer" as defined by the WPA, the Plaintiffs' claim should fail. Plaintiffs allege they engaged in protected activity under the WPA by voicing concerns about the PWPD.

The WPA states, it "shall be unlawful for an employer to discharge a . . . protected person . . . because of that person's status as a protected person." Mo. Rev. Stat. § 285.575.4. The WPA states that an "'Employer' shall not include the state of Missouri or its agencies, instrumentalities, or political subdivisions …." Mo. Rev. Stat. § 285.575.2(2). Missouri courts have defined the term "political subdivision" to include "a county, city, town, village, or township of a township organization county" and "unit of this state empowered by law to maintain a law enforcement agency." *Guy v. City of St. Louis*, 829 S.W.2d 66, 68 (Mo. App. E.D. 1992) (citing Mo. Rev. Stat. § 115.013(18).; Mo. Rev. Stat. § 70.815.1(2).)

Here, the Court agrees with Defendants. Since the WPA does not define "political subdivision," this Court will give the words used their "usual, plain and ordinary meaning." *Id*. The Court finds that Platte Woods is a city with the statutory authority to maintain its own law enforcement agency. As a result, it is a political subdivision and not an "employer" under § 285.575. For this reason, Defendants are entitled to judgment in their favor on Count I of Plaintiffs' Complaint.

### B. Count II: Retaliatory Discharge in Violation of the MWCA

Defendants move for summary judgment on Count II, asserting Retaliatory Discharge in violation of the MWCA. Defendants argue they are entitled to summary judgment because sovereign immunity bars Noon's MWCA claim. Plaintiffs allege that the Missouri legislature waived sovereign immunity for municipal corporations under the MWCA and thus Noon's claim is not precluded by sovereign immunity.

"Sovereign immunity is a judicial doctrine that precludes bringing suit against the government without its consent." *Div. of Motor Carrier & R.R. Safety v. Russell*, 91 S.W.3d 612, 615 (Mo. banc 2002). "Because the liability of a public entity for torts is the exception to the general rule of sovereign immunity, a plaintiff must specifically plead facts demonstrating that the claim is within an exception to sovereign immunity." *Hummel v. St. Charles City R-3 Sch. Dist.*, 114 S.W.3d 282, 284 (Mo. App. E.D. 2003) (citing *Burke v. City of St. Louis,* 349 S.W.2d 930 (Mo. 1961)). "Under Missouri law, municipalities are not immune from liability arising from their proprietary activities." *Nichols v. City of Kirksville*, 68 F.3d 245, 247 (8th Cir. 1995). "Hiring and firing city employees are governmental, not proprietary, activities." *Id.*

Here, the Court finds that Count II is barred by sovereign immunity. Platte Woods is a municipal corporation and has not waived its immunity from suit. Though this immunity can be waived through the purchase of liability insurance, that is not the case here. When a public entity purchases liability insurance for tort claims, sovereign immunity is waived to the extent of and for the specific purposes of the insurance purchased. The policy itself states that it "is not intended to, nor does it waive, nor shall it be construed as waiving in any way whatsoever, any sovereign immunity or official immunity …." (Doc. #29-1, p. 10.) The policy goes on to state that the "terms 'sovereign immunity' and 'official immunity' shall be given the broadest interpretation allowed by law." (Doc. #29-1, p. 10.) Plaintiffs have presented no persuasive evidence to demonstrate that the city through its insurance policy intended to limit its immunity for MWCA claims. The Court finds that the insurance policy in question does not waive the municipal corporation's sovereign immunity for the purposes of being held liable under the

MWCA.[2] As a result, Defendants are entitled to summary judgment on Count II of Plaintiff's Complaint.

### C. Count III & IV: First Amendment Retaliation under 42 U.S.C. § 1983

In addressing Counts III and IV, the Court will address the res judicata argument raised by Defendants. Next, there will be an analysis of the multi-step inquiry that is required by the caselaw for First Amendment Retaliation claims. These steps include determining whether the speech (the Complaint Packet) was protected, whether the plaintiff suffered an adverse action, and if there was a causal connection between the two. Following this, the First Amendment Retaliation caselaw requires a balancing the employee's right to free speech against the interests of the public employer. Finally, the Defendants' affirmative defense of qualified immunity will be addressed to the extent it protects them from the First Amendment Retaliation claims.

But first, *Curtis v. Christian Cnty., Missouri*, 963 F.3d 777, 784 (8th Cir. 2020) also involved a First Amendment retaliation claim. However, *Curtis* is factually and legally distinguishable. Specifically, *Curtis* involved public employees who were dismissed for political speech related to an election for a new sheriff. In contrast, the plaintiffs in this case assert a retaliation claim based on their speech of malfeasance and impropriety by the leader of the PWPD. The 8th Circuit has held that if "an employee is discharged because of his or her expressive conduct, we apply the *Pickering–Connick* test." *Thompson v. Shock*, 852 F.3d 786, 792 (8th Cir. 2017). "If an employee is discharged because of his or her political affiliation, we

---

[2] Missouri courts have held in cases addressing identical language in insurance policies held by cities that the language still preserves sovereign immunity. *See Brooks v. City of Sugar Creek*, 340 S.W.3d 201, 209 (Mo. App. W.D. 2011) (This Court finds that the language contained in [the policy] does not waive [city's] sovereign immunity as a public entity retains its full sovereign immunity when the insurance policy contains a disclaimer stating that the entity's procurement of the policy was not meant to constitute a waiver of sovereign immunity.)

8

apply the *Elrod–Branti* test." *Id.* Because *Curtis* involved different facts and a different legal test, it is not applicable to this case.

### 1. Res Judicata

Defendants move for summary judgment on Counts III and IV, asserting First Amendment Retaliation under 42 U.S.C. § 1983. Defendants argue Plaintiffs have already had a full and fair opportunity to litigate their claims against John Smedley and James Kerns in their individual capacities in the First Lawsuit and thus this claim is barred by res judicata. Plaintiffs argue that res judicata does not bar their claim.

Under federal common law, the doctrine of res judicata, or claim preclusion, applies "when (1) the first suit resulted in a final judgment on the merits; (2) the first suit was based on proper jurisdiction; (3) both suits involve the same parties (or those in privity with them); and (4) both suits are based upon the same claims or causes of action." *Elbert v. Carter*, 903 F.3d 779, 782 (8th Cir. 2018). "[W]hether two claims are the same for res judicata purposes depends on whether the claims arise out of the same nucleus of operative fact or are based upon the same factual predicate." *Id.*[3]

Here, the Court finds that Counts III and IV are not barred by res judicata. In the First Lawsuit, Plaintiffs only asserted official capacity claims against Kerns and Smedley. In the Second Lawsuit, Plaintiffs only assert individual capacity claims against Kerns and Smedley. Plaintiffs' argument is persuasive. Defendants have failed to provide legal support for their argument. They have not identified any cases showing that res judicata is warranted when, as here, a plaintiff sues an official in his or her official capacity, the claim is dismissed, and

---

[3] Defendants and Plaintiffs do not dispute that the First Lawsuit resulted in a final judgment on the merits based on proper jurisdiction. The Court also finds that the suits are based upon the same claims or causes of action. Additionally, the same facts which formed the basis of the First Lawsuit form the basis for this case. Namely, the decision to terminate Plaintiffs' employment with the PWPD after Plaintiffs published complaints about Kerns. The Court's analysis thus turns to the privity requirement.

9

subsequently the plaintiff sues that official in his or her individual capacity in a second lawsuit. Defendants' argument for summary judgment based on res judicata is denied.

### 2. Plaintiffs' Speech was Causally Connected to Adverse Action
#### a) Plaintiffs Engaged in Protected Speech

Defendants also argue that summary judgment is warranted on Counts III and IV because Plaintiffs' speech in the Complaint Packet is not protected by the First Amendment. Specifically, Defendants argue that Plaintiffs were not speaking as private citizens, but were instead speaking pursuant to their duties as Platte Woods police officers. Plaintiffs counter that they engaged in protected speech, as private citizens, on matters of public concern.

"To establish a prima facie case of retaliation based on the First Amendment, a plaintiff must allege and prove he engaged in conduct protected by the First Amendment and the protected conduct was a substantial or motivating factor in the employer's decision to take the adverse employment action." *Hughes v. Stottlemyre*, 454 F.3d 791, 796 (8th Cir. 2006). "A public employee engages in speech protected under the First Amendment if he speaks 'as a citizen on a matter of public concern.'" *Wright v. City of Salisbury, Mo.*, 656 F. Supp. 2d 1013 (E.D. Mo. 2009) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 418, 126 S. Ct. 1951 (2006)). "Speech is a matter of public concern when a public employee speaks as a concerned citizen, but not when the employee speaks as an employee." *Bausworth v. Hazelwood Sch. Dist.*, 986 F.2d 1197, 1198 (8th Cir. 1993). "An employee's speech touches upon a matter of public concern when it is a matter of political, social, or other concern to the community at large." *Kincade v. City of Blue Springs, Mo.*, 64 F.3d 389, 396 (8th Cir. 1995). Courts addressing claims by public employees who contend that they have been discharged for exercising their right to free speech must employ a two-step inquiry. *Id.* at 395. "First, the court must determine whether the speech

may be described as "speech on a matter of public concern.'" *Id.* If so, the second step involves balancing the employee's right to free speech against the interests of the public employer. *Id.*

Here, the Court finds that Plaintiffs have presented evidence showing that their speech was a matter of public concern. Defendants argue the Complaint Packet is not a matter of public concern and is speech pursuant to the officers' duties because it states, "it is our belief that our oath of office requires us to take this action, as part of that service." (Doc. #29-6, p. 1.) However, Plaintiffs did not make the statements contained in the Complaint Packet merely as employees concerned only with internal policies or practices which are relevant only to employees. Rather, the packet touched upon matters of public concern. It detailed safety concerns regarding a firearm-wielding officer suffering from mental instability who could potentially put other officers and citizens in the community at risk. Also, it addresses serious mechanical problems regarding patrol vehicles which would pose a threat to both members of the police department and the public with whom the department shares the road. Further, the Complaint Packet alleges crimes which were committed and not properly acted upon by the PWPD. Plaintiffs have shown that these and other issues in the document are of importance to not just the department, but to the public generally.

In the instant case, the record supports a finding that the content in the Complaint Packet goes beyond the official duties of officers Noon and Mr. Skidmore. For example, the Complaint Packet details the crude nature in which high ranking officers purportedly interreacted with subordinates by showing them explicit images. This is an example of an action that would be of public concern, but it also falls outside the duties of Plaintiffs Mr. Skidmore and Noon. In other words, no evidence has been presented that resolution of inappropriate behavior between officers is within the duties of Plaintiffs Noon nor Mr. Skidmore. Due to the nature of the problems

11

raised in the Complaint Packet, Defendants' contention that the Complaint Packet is not a matter of public concern as required by law is unpersuasive. A reasonable jury could conclude that Plaintiffs Noon and Mr. Skidmore engaged in protected conduct through the Complaint Packet.

### b) Adverse Employment Action

Here, the Court finds that Plaintiffs presented sufficient evidence showing a causal connection between the exercise of their speech and adverse employment actions. As discussed, Plaintiffs Noon and Mr. Skidmore engaged in protected activity in the creation and submission of the Complaint Packet. The record supports a finding that the PWPD then took adverse employment action against them. Evidence was produced showing that Kerns and Smedley discussed how to deal with the Complaint Packet and the officers who produced it. In late November 2019, Mr. Skidmore's administrative rights were blocked on the computer system, and he was not able to assign shifts. In December 2019, Noon's computer was "wiped," and he was denied access to his office. By January 2020, none of the Plaintiffs were given the opportunity to take on shifts at work. By March 2022, all Plaintiffs had been laid off. These adverse actions, based on the sequence of events, were causally linked to the protected speech in the Complaint Packet. Since the Court has found the speech to be protected and adverse employment was taken against Plaintiffs Noon and Mr. Skidmore, First Amendment Retaliation caselaw requires the Court engage in the *Pickering-Connick* balancing test.

### 3. *Pickering-Connick* Balancing Test

"The typical *Pickering–Connick* case involves a government employee causing workplace disruption by speaking as a citizen on a matter of public concern, followed by government action adversely affecting the employee's job." *Thompson v. Shock*, 852 F.3d 786, 791 (8th Cir. 2017). *see also Pickering v. Bd. of Educ. Of Twp. High Sch. Dist. 205, Will Cnty.,*

*Ill.*, 391 U.S. 563, 568 (1968); *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). "In determining a public employee's rights of free speech, the problem is to arrive at a balance between the interests of the [employee], as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Connick*, 461 U.S. 138, 138, (1983) (internal citations omitted).

The Court finds analysis of the *Pickering-Connick* test to be necessary in this case. Mr. Skidmore testified that after the Complaint Packet was delivered, there was a deterioration in relationships among officers. Noon acknowledged that other officers became angry with him after the Complaint Packet was released. Further, a fellow officer noted regarding Noon's actions, "[e]very one of you are so focused on making sure agendas are met that the department is suffering and it's fallen on my shoulders to keep it going." (Doc. #29-3, p. 70.) Based on these facts, there is sufficient evidence of a disruption to proceed to the *Pickering-Connick* balancing test.

To balance the employee's and the State's interests, courts refer to a number of factors: "(1) the need for harmony in the work place, (2) whether the government's responsibilities require a close working relationship, (3) the time, manner, and place of the speech, (4) the context in which the dispute arose, (5) the degree of public interest in the speech, and (6) whether the speech impeded the employee's ability to perform his or her duties." *Anzaldua v. Northeast Ambulance and Fire Protection Dist.*, 793 F.3d 822, 835 (8th Cir. 2015).

The Court finds two factors which weigh heavily in the analysis for the terminated employees. These factors are the degree of public interest in the speech and whether the speech impeded the employee's ability to perform his or her duties. As detailed in the prior section, the

Complaint Packet contains a series of allegations which implicate the way crimes are addressed, the relative safety of the equipment used by the department, the culture of the department, and other areas. These issues raised could reasonably be viewed as having a high degree of interest for the public. The second factor, the extent to which the employees were able to perform their duties, also weighs for the terminated employees. Specifically, there is no evidence of an inability of the Plaintiffs to complete their work activities after the Complaint Packet was delivered. Rather, there is evidence of the Plaintiffs attempting to take on their usual responsibilities but being unable to do so due to the adverse actions taken by the PWPD.

The PWPD, even more so than other government employers, "has a significant government interest in regulating the speech activities of its officers in order 'to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence in the law enforcement institution.'" *Hughes v. Whitmer*, 714 F.2d 1407, 1419 (8th Cir. 1983) (quoting *Gasparinetti v. Kerr*, 568 F.2d 311, 315–16 (3rd Cir. 1977), *cert. denied*, 436 U.S. 903 (1978)). The PWPD should therefore "be accorded much wider latitude than the normal government employer in dealing with dissension within its ranks." *Id.* (citations omitted). However, an employee's First Amendment interest in speech is heightened if Plaintiff can show he blew the whistle on government malfeasance and exposed government corruption. *Id.* at 1423. In the Complaint Packet, allegations of corruption and malfeasance suggest financial mismanagement in which thousands of dollars in cash receipts went unreconciled with the department and crimes were not being adequately addressed.

As a result, the PWPD's significant government interest in maintaining morale, discipline, and efficiency does not outweigh those of Plaintiff's speech on a matter of public

concern. As a result, Defendants are not entitled to summary judgment on Count III and IV of Plaintiffs' Complaint.

However, since Mrs. Skidmore did not participate in the creation or distribution of the Complaint Packet, her speech does not fall under the same analysis. Rather, Mrs. Skidmore admitted and testified that in addition to her patrol duties at the PWPD, she was responsible for reviewing officer log sheets to make sure they were accurate. Thus, it was a part of her duty to alert her superiors when the log sheets were not filled out correctly. The First Amendment does not protect a public employee's speech if it "owes its existence to [her] professional responsibilities." *Lyons v. Vaught*, 875 F.3d 1168, 1174 (8th Cir. 2017) (quoting *McGee v. Pub. Water Supply, Dist. No. 2 of Jefferson Cty., Mo.*, 471 F.3d 918, 921 (8th Cir. 2006)). Mrs. Skidmore's alleged "protected activity"—concerns over incorrect log sheets, her patrol vehicle, and cleanliness of her vehicle and workspace—was made pursuant to her job duties, and, accordingly, is not protected by the First Amendment. For these reasons, Defendants are entitled to summary judgment on Mrs. Skidmore's First Amendment Retaliation claim because there was not a finding that she engaged in protected conduct.

### 4. Defendants are Not Entitled to Qualified Immunity

Defendants argue that Kerns and Smedley have qualified immunity from Plaintiffs' First Amendment Retaliation claims. They argue this is the case because (1) Plaintiffs' speech was made pursuant to their duty as police officers and not as private citizens, and (2) the law at the time did not clearly establish that Kerns and/or Smedley could not terminate Plaintiffs for engaging in disruptive conduct/speech under the circumstances for Counts III and IV. Plaintiffs argue Defendants are not entitled to qualified immunity because the terminations constituted a violation of a constitutional right that was clearly established.

15

Case 5:21-cv-06159-SRB   Document 38   Filed 12/21/22   Page 15 of 17

"In a § 1983 action, qualified immunity shields a government official from liability unless his or her conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Nord v. Walsh County*, 757 F.3d 734, 738 (8th Cir. 2014). "Qualified immunity analysis requires a two-step inquiry: (1) whether the facts shown by plaintiff make out a violation of a constitutional statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Id.* Unless both questions are answered affirmatively, the defendant is entitled to qualified immunity. *Id. See Hope v. Pelzer*, 536 U.S. 730, 739 (2002)) ("For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.").

As described above with the First Amendment analysis, Plaintiffs Noon and Mr. Skidmore alleged a specific violation of a constitutional right. Specifically, this Court found that Plaintiffs have created a genuine dispute of material fact as to whether Defendants violated Plaintiffs' First Amendment right when they were fired for creating the Complaint Packet which expressed views which were of concern to the broader public. Thus, the first prong of the qualified immunity analysis does not warrant a defense from summary judgment for the Defendants.

Under the second prong of qualified immunity analysis, "the allegedly violated constitutional right must have been clearly established at the time of the alleged violation." *Greer v. Shoop*, 141 F.3d 824, 826 (8th Cir. 1998). "For a constitutional right to be clearly established, the contours of that right must be sufficiently clear and specific that a reasonable official would understand that what he is doing violates that right." *Id.* "This is not to say that an official action is protected by qualified immunity unless the very action in question has

previously been held unlawful; but it is to say that in the light of pre-existing law, the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S, 635, 641 (1987).

Here, it is clearly established that the state may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech. *Perry v. Sindermann,* 408 U.S. 593, 597, (1972); *see also Kincade v. City of Blue Springs, Mo*., 64 F.3d 389 (8th Cir. 1995) (employee's comments regarding city dam project touched upon matters of public concern and were constitutionally protected, as required for First Amendment unlawful discharge claim). At the time of Noon and Mr. Skidmore's respective terminations, the case law made clear that speech touches upon a matter of public concern when it deals with issues of interest to the community. *Cox v. Dardanelle Pub. Sch. Dist.,* 790 F.2d 668, 672 (8th Cir. 1986)*.* As noted above, the Complaint Packet clearly addressed issues that would be of serious concern to the public, not issues that have some personal interest only to Plaintiffs. Accordingly, for Counts III & IV addressing First Amendment Retaliation in Violation of § 1983, summary judgment on behalf of the Defendants is denied.

### IV. CONCLUSION

For the reasons stated above, Defendants Motion for Summary Judgment (Doc. #28) is GRANTED IN PART AND DENIED IN PART. Defendants are entitled to summary judgement on Counts I and II against all Plaintiffs. Defendants are entitled to summary judgement on Counts III and IV for Plaintiff Mrs. Skidmore. Defendants are not entitled to summary judgement on Counts III and IV for Plaintiffs Noon and Mr. Skidmore.

**IT IS SO ORDERED.**

/s/ Stephen R. Bough
STEPHEN R. BOUGH
UNITED STATES DISTRICT JUDGE

Dated: December 21, 2022

17

Case 5:21-cv-06159-SRB   Document 38   Filed 12/21/22   Page 17 of 17